THE WESTERN UNION TELEGRAPH COMPANY OF ILLINOIS, Appellant, *vs.* THE LOUISVILLE AND NASHVILLE RAILROAD COMPANY *et al.* Appellees.

*Opinion filed October 27, 1915—Rehearing denied Dec. 17, 1915.*

1. EMINENT DOMAIN—*right of·eminent domain defined.* The right of eminent domain is the right of the nation or the State, or of those to whom the power has been lawfully delegated, to condemn private property for public use and to appropriate the ownership or possession of such property for such use upon paying the owner just compensation, to be ascertained by law.

2. SAME—*power to condemn right of way for a telegraph line along railroad leased by inter-State carrier.* A telegraph corporation organized under the laws of Illinois is not by the Inter-State Commerce act deprived of the power to condemn a right of way for a telegraph line along a railroad in Illinois owned by an Illinois corporation, even though the railroad is leased to a foreign railroad corporation which is engaged in inter-State commerce.

3. SAME—*Federal act of 1866 does not prevent condemnation by domestic telegraph corporation.* The passage of the Federal act of July 24, 1866, does not amount to an assumption by Congress of all power over telegraph lines engaged in inter-State commerce nor prevent the condemnation by an Illinois telegraph corporation of a right of way for a telegraph line along a railroad in Illinois owned by an Illinois corporation and leased to a foreign railroad corporation which engaged in inter-State commerce.

4. SAME—*what does not involve a conflict of State and Federal jurisdictions.* A conflict of State and Federal jurisdictions with respect to the condemnation of a right of way across a navigable stream forming a State boundary is not involved where the petition merely seeks to condemn the right of way within the boundaries of the State.

5. SAME—*what is not necessary to sufficiency of description of right of way for telegraph lines.* It is not necessary to the sufficiency of the description of the right of way for a telegraph line that the petition shall describe and locate each pole or that there be filed a plat of the location of the proposed line.

6. SAME—*what is a sufficient showing of a failure to agree upon compensation.* A condemnation petition which shows that an offer has been made by the petitioning telegraph company for the right of way and that the owner has refused the offer sufficiently shows a failure to agree upon the compensation.

7. SAME—*claim that petitioner is acting fraudulently and collusively cannot be considered.*   If the incorporation of a telegraph company in Illinois is regular in form, the claim that the corporation was organized for an unlawful purpose and is acting collusively with a certain foreign telegraph corporation cannot be considered in a proceeding by the corporation to condemn a right of way for its telegraph line along a railroad.

8. SAME—*agreement by petitioner limiting character of easement sought is binding.*   Where a telegraph company avers and agrees in its petition for condemnation that it will construct and operate its telegraph line along the defendant's railroad in a certain manner and in such a way as not to incommode the public use of the railroad, the petitioner is bound by such averment and agreement limiting the character of the easement.

9. SAME—*when railroad company has no preferential right.*   If the existing telegraph line constructed along a railroad right of way does not belong to the railroad company but to a foreign corporation which erected the line by contract with the railroad company, the railroad company, when the contract is terminated, has no preferential right to select the route of the existing telegraph line for a telegraph line of its own as against a domestic telegraph corporation which has made a prior selection of such route, even though such selection was made while the contract was still in force but after notice of its termination was given.

COOKE, J., FARMER, C. J., and DUNN, J., dissenting.

APPEAL from the County Court of St. Clair county; the Hon. WILLIAM S. DEWEY, Judge, presiding.

WEST & ECKHART, (PERCY B. ECKHART, of counsel,) for appellant.

H. L. STONE, J. M. HAMILL, and C. P. HAMILL, for appellees.

Mr. JUSTICE CRAIG delivered the opinion of the court:

This is an appeal by the Western Union Telegraph Company of Illinois, an Illinois corporation, from an order of the county court of St. Clair county dismissing a petition for condemnation filed by the appellant on February 3, 1912, seeking to condemn an easement in the right of way of the

Southeast and St. Louis Railway Company, leased to the Louisville and Nashville Railroad Company.

The condemnation petition, as finally amended, sets up, in substance, that the petitioner is a corporation duly organized as a telegraph company under the laws of the State of Illinois for the purpose of owning, constructing, maintaining and operating lines of telegraph in the State of Illinois; that under and by virtue of the laws of the State of Illinois it is empowered to exercise the right of eminent domain and to construct lines of telegraph along and upon any railroad within the State in such manner and at such points as not to incommode the public use of said railroad; that the Southeast and St. Louis Railway Company, one of the defendants, is a corporation organized and existing under the laws of the State of Illinois, and is the owner of a railroad having a right of way varying from twenty-five feet to two hundred feet in width, extending easterly out of the city of East St. Louis through a portion of the counties of St. Clair, Clinton, Washington, Jefferson, Hamilton and White, to the center thread of the permanent stream of the Wabash river, in said White county, and that said railroad company is also the owner of two certain branches of railroad also located within the State of Illinois; that said railroad and its said two branches extend in all a distance of about 179 miles; that the Southeast and St. Louis Railway Company, on January 27, 1881, leased to the Louisville and Nashville Railroad Company, also a defendant, the aforesaid right of way, with the right to use and operate said railroad for forty-nine years; that said Louisville and Nashville Railroad Company is a Kentucky corporation, and is operating a single line of railroad from said city of East St. Louis, in St. Clair county, to the center thread of the permanent stream of the Wabash river, in White county, with branches to the town of O'Fallon, in St. Clair county, and from McLeansboro, in Hamilton county, to Shawneetown, in Gallatin county, all in the

State of Illinois; that the petitioner desires to construct a line of telegraph over, along and upon said railroad; that a part of said railroad upon which the petitioner seeks to construct, maintain and operate its proposed line is situated in St. Clair county; that petitioner has located its proposed line upon said right of way and branches of said railroad described as aforesaid, and that it does not seek to acquire the fee of any lands or the right to use the same for any purpose except to erect, maintain and operate the proposed line for telegraph purposes; that the line of telegraph proposed to be constructed, maintained and operated upon said railroad between said designated places will be of the best material and upon the most approved plans; that the poles will be not less than sixteen feet nor more than seventy feet long, not less than twenty inches and not more than seventy-five inches in circumference at the base, tapering about one inch in five feet, the poles to be erected by being firmly set in the ground to a depth of not less than three feet and not more than nine and one-half feet; that the number of poles to the mile shall not be less than thirty nor more than sixty-five; that the dimensions of the poles, the depth at which set and the number of poles to the mile will vary according to the load in wires and cables to be placed upon such poles in order that the pole line shall be of proper strength; that there will be attached to such poles, near the top thereof, suitable cross-arms not to exceed ten feet in length, with insulators thereon, upon which will be strung wires of suitable material and sufficient in number to enable the petitioner to promptly transmit all telegraph messages offered to it for transmission; that the said proposed telegraph lines shall be constructed and maintained upon the southerly side of said right of way from the city of East St. Louis to the center thread of the permanent stream of the Wabash river, upon the south-westerly side of said right of way from the town of McLeansboro to the town of Shawneetown, and along the

north-westerly side of said right of way from a point upon the main line of said railroad approximately sixteen and three-fourths miles from the main station at East St. Louis to the town of O'Fallon, and not less than seven feet from the nearest rail of the main line of said railroad; that all wires, cross-arms and other attachments which are less than seven feet distant, horizontally, from the nearest rail of the main line of said railroad shall have a vertical clearance above the top of the rails of not less than twenty-five feet; that in places where the line crosses the tracks, or where it is necessary to do so to prevent interference with the work of said railroad, petitioner's poles will be of such height as to permit the wires to be suspended so far above any structure of the railroad company as to prevent any interference therewith; that in no place will the clearance above the nearest rail be less than twenty-five feet at such points of crossing; that said poles will be so erected and said telegraph line so constructed and maintained as not to obstruct or interfere with the business or use of said railroad and so as not to violate any provisions of the statutes of the State of Illinois. The following paragraph was added to the petition by amendment January 12, 1914:

"That petitioner does not seek hereby to acquire the space occupied, at the time of the filing of the petition herein, by any wire or wires on the said railroad right of way which said defendant railroad company at such time may have owned or operated; and petitioner represents, offers, stipulates and agrees that it will accommodate, carry and support upon petitioner's said proposed telegraph-pole line such wire or wires as the said railroad company, at the time of the filing of the petition herein, owned or operated upon said railroad right of way and such additional telegraph or telephone wires as may thereafter be needed by said railroad company in the conduct of its business, and afford to said railroad company like benefits and .advantages, in respect to position and operation of all of said

wires, as said railroad company enjoyed at the time of the filing of the petition herein."

The petition further set out that petitioner stipulates and agrees that in the event that the said railroad company shall at any time desire to change the location of its tracks or construct new tracks, side-tracks or buildings where the same do not now exist, by reason of which new construction or change of tracks the petitioner's proposed telegraph line may incommode the use of said railroad, then the petitioner will move such poles to such other point or points on said railroad and right of way as may be designated by said railroad company, and upon reasonable notice, and at the sole expense of the petitioner; that the petitioner has applied to said Southeast and St. Louis Railway Company and said Louisville and Nashville Railroad Company for permission to construct said telegraph-pole line upon said right of way but that said permission has been refused by said railroad companies, and that the petitioner is unable to agree with said railroad companies upon the just compensation to be paid by the petitioner to said railroad companies for the taking and use of said easement upon said railroad for the petitioner's proposed telegraph-pole line.

Thereafter the defendants filed their petition for a removal of said cause to the United States district court for the eastern district of Illinois, on the ground that the suit was solely of a civil nature and arose under the constitution and the laws of the United States, together with a bond for such removal, and the cause was removed to the said court. In the latter court the petitioner (appellant here) made an application to remand the cause to the county court of St. Clair county, which application was denied and jurisdiction under the removal was upheld, and subsequently the proceedings for condemnation were dismissed. On appeal to the circuit court of appeals of the seventh circuit the judgment of the district court was reversed for want of jurisdiction in that court and the cause was remanded to

the district court, with directions to remand the said cause to the county court of St. Clair county, which was done. (*Western Union Telegraph Co. of Illinois* v. *Southeast and St. Louis Railway Co.* 125 C. C. A. 466.) Upon said cause being remanded the defendants to the petition filed thirty-one objections to the petition and a motion to dismiss. A hearing was had and a large amount of evidence taken on the objections. Of defendants' original objections the court overruled 1 to 9, inclusive, and 18 to 31, inclusive, and sustained objections 10 to 17, inclusive; and of the objections to the amendment made January 12, 1914, objections 1, 2, 4, 6, 7, 9, 10, 11 and 16 were overruled, and 3, 5, 8, 12, 13, 14 and 15 were sustained, and thereupon the court dismissed the petition to condemn and entered judgment against petitioner for costs of suit.

The objections that were overruled were to the following effect: That the act of the General Assembly of the State of Illinois approved March 24, 1874, in force July 1, 1874, authorizing telegraph companies to condemn rights of way for their lines along and upon any railroad in the State of Illinois is in violation of the constitution of Illinois, and also violative of paragraph 3 of section 8 of article 1 of the constitution of the United States and of the fifth and fourteenth amendments to the constitution of the United States, and that since the passage of the acts of Congress of June 15, 1866, and June 8, 1872, relating to post-roads, no State has the power to confer upon telegraph companies the right of eminent domain to condemn any part of the right of way of an inter-State railroad; that the petitioner has no authority to condemn any portion of the right of way of the defendants, since defendants own and operate a railroad engaged in inter-State commerce; that the petitioner is neither a *de jure* corporation nor a *de facto* corporation, and hence has no power to condemn; that the description, in the amended petition, of the right of way sought to be condemned is void for uncertainty;

that the petitioner is guilty of fraud and collusion with the Western Union Telegraph Company of New York and is seeking to violate the public policy of the State of Illinois, and therefore cannot condemn; that there is no allegation in the petition that the petitioner and the defendants attempted and failed to agree as to the amount of compensation to be paid by petitioner to defendants; that only the Federal court has jurisdiction of the controversy, since Federal questions are involved in the proceedings. The objections sustained by the court were, in substance, as follows: That the defendants have a preferential right of location for their line of telegraph for railroad purposes, and having selected and located a line of telegraph for their own use, petitioner cannot secure an easement for its line on the same location; that the construction of a telegraph line on the south side of defendants' right of way, as proposed by petitioner, would incommode the public use of the railroad; that the location now sought by the petitioner for the proposed telegraph line is already devoted to a similar public use by the defendant railroad companies and cannot be condemned by the petitioner for the use sought by it.

The objections to the amendment to the petition of January 12, 1914, which the court overruled, were, in substance, that the petition could not be amended since it would change the location of the petitioner's line as described in its amended petition; that the amended petition filed February 16, 1912, and the evidence introduced thereon, indicate the location of the proposed telegraph line to be where the Western Union Telegraph Company, a corporation of New York, had formerly constructed and maintained a line of poles and wires, and the petitioner is now estopped from making a new location on the railroad right of way; that until petitioner has acquired a right of way by condemnation it can make no stipulation as to how such right of way shall be used; that as petitioner owns neither right of way, poles, cross-arms or wires, it cannot stipulate, being

without power to carry out the terms of the stipulation; that petitioner cannot make an agreement with the railroad companies, since the railroad companies refuse to stipulate; that the proposed agreement by petitioner would constitute a joint line of poles and wires, which would result in constant conflict of authority and responsibility, and the court has no authority to impose a joint arrangement upon the defendants. The objections sustained by the court were: That the petitioner cannot acquire a right of way by a stipulation not agreed to by the railroad companies; that petitioner has no power to bind a railroad as to how it shall use its own right of way; that the defendant the Louisville and Nashville Railroad Company is entitled to use its right of way free from interference, joint possession, ownership or partnership of a pole line with the petitioner; that petitioner cannot gain the benefits and advantages of the stipulation without a written contract, and defendants decline to enter into a written contract with petitioner; that the right of the Louisville and Nashville Railroad Company to maintain and operate an existing telegraph line owned by it and devoted to public service, and to erect and maintain additional telegraph and telephone wires, is necessary to efficiently carry on its railroad business, and its right to enjoy the free and separate use and possession of said property independently of other control or ownership is of great value, of which it cannot be deprived in the proceedings without violating the fourteenth amendment of the Federal constitution, or interfering with the transaction of its inter-State and intra-State business, in violation of the act of Congress approved July 24, 1866.

From the order sustaining these objections and dismissing the petition the petitioner prayed an appeal to this court, and assigns as error the action of the county court in sustaining the objections and dismissing the petition to condemn. Appellees have assigned as cross-errors the action

of the county court in overruling the other objections to the petition.

It was assumed by the court and the parties that the objections and the motion to dismiss the petition put in issue the sufficiency of the petition and the petitioner's right to condemn, and upon this issue evidence was taken, with-out objection, by both parties as to the status of the parties to the suit, their previous business relations and dealings, and other matters leading up to the filing of the petition to condemn. These facts, so far as material, are as follows:

On June 18, 1884, the Louisville and Nashville Railroad Company and the Western Union Telegraph Company, a corporation organized under the laws of the State of New York, entered into a written contract whereby the railroad company granted to the telegraph company for a term of twenty-five years from July 1, 1884, the exclusive right to construct and maintain telegraph lines upon the rights of way owned or controlled by the railroad company during the existence of the contract. It was further provided that after the expiration of twenty-five years the contract should continue in force until the expiration of one year after written notice should be given by one of the parties to the other of an intention to terminate the same. The telegraph company, among other things, agreed to set apart one wire for the preferential use of the railroad company, and further agreed that if the railroad company should at any time require greater wire facilities on any portion of its road the telegraph company would furnish an additional wire for the railroad company at the cost price thereof upon its poles, or the railroad company might at its own cost string such additional wire upon the telegraph company's poles in such manner and position as the telegraph company might direct. In 1901 the telegraph company, at the request of the railroad company, strung an additional wire for the railroad company upon its poles, and the cost thereof, amounting to $3820.61, was paid by the

railroad company.' This wire has ever since remained upon the poles of the telegraph company and has been used exclusively by the railroad company. In 1902 the Western Union re-built its system along the railroad company's right of way and placed the poles in new places on the south side of the right of way and about five feet laterally from the old poles. The wires used by the railroad company were moved to other places on the cross-arms and poles selected by the telegraph company, and the telegraph company continued to maintain, repair and furnish current for these wires so used by the railroad company to the date of filing this petition. On August 17, 1911, the telegraph company served notice upon the railroad company that it would on August 17, 1912, terminate the contract above mentioned. On October 5, 1911, the Western Union Telegraph Company of Illinois was organized under the laws of this State with a capital stock of $25,000, for the purpose of owning, constructing, maintaining and operating lines of magnetic telegraph in the State of Illinois. The subscribers to the capital stock were all officers or employees of the Western Union Telegraph Company of New York and their subscriptions to the capital stock were paid by the Western Union Telegraph Company of New York. The directors and officers of the Illinois corporation were elected from among the stockholders. It also appears that the organization of the Illinois corporation was brought about by the Western Union Telegraph Company of New York for the purpose of condemning the right of way sought in the petition subsequently filed. In November, 1911, the charter of the Louisville and Nashville Railroad Company was amended, and the railroad company, in addition to the powers conferred upon it by its original charter, was thereby authorized to construct and operate telegraph and telephone lines, not only for use in operating its railroad, but also for the purpose of serving the public as a common carrier of messages. On January 12, 1912, the president of

the Western Union Telegraph Company of Illinois directed
the district foreman of the Western Union Telegraph Com-
pany of New York to locate a telegraph-pole line for the
Western Union Telegraph Company of Illinois along the
right of way of the Louisville and Nashville Railroad Com-
pany in Illinois, and to locate such line practically on the
same line then occupied by the poles and wires of the West-
ern Union Telegraph Company of New York. These in-
structions were carried out, and the line was located on the
south side of the railroad right of way and followed the
line then occupied by the poles and wires of the Western
Union Telegraph Company of New York. On January 31,
1912, the Western Union Telegraph Company of Illinois
made a formal offer to the railroad company of five dollars
per mile for an easement for a pole line upon the railroad
right of way. This offer was refused, and the railroad
company refused to submit a counter-offer or state what it
was willing to do. On February 3, 1912, the petitioner
filed its original petition to condemn the right of way de-
scribed in said petition, in the county court of St. Clair
county. On February 9, 1912, the board of directors of
the petitioning company, by resolution, determined to ac-
cept, and did by appropriate action accept, the obligations
and restrictions of the act of Congress approved July 24,
1866. On February 12, 1912, the Post-master General of
the United States acknowledged the receipt and filing in the
post-office department at Washington of said acceptance of
the act of Congress. On the 27th day of February, 1912,
employees of the Louisville and Nashville Railroad Com-
pany, acting under oral instructions from its chief engineer,
laid out and located a proposed telegraph-pole line for said
railroad company upon the southerly side of its right of way
in Illinois, selecting practically the same location as that de-
scribed by petitioner in its letter of January 12, 1912, and
in its original and amended condemnation petitions filed on
February 3 and February 16, 1912, respectively, and prac-

tically identical with the proposed pole line theretofore located by employees of the petitioning company on the railroad company's right of way in Illinois between the 16th and 22d days of January, 1912. Instructions for this work were given February 1 and afterwards commenced on the line of the road in Tennessee, but the locating was not commenced in Illinois, as shown by the evidence, until February 27, 1912. On August 5, 1912, the railroad company gave written notice to the Western Union Telegraph Company of New York requiring the latter to commence immediately after August 17, 1912, to remove from the railroad right of way and premises all the poles, wires, batteries, instruments, appliances and other fixtures comprising the telegraph line, and to complete such removal previous to December 1, 1912. The telegraph company was further notified that in default of its compliance with such requirement of removal previous to the prescribed date, the railroad company would take possession of, appropriate and use, after that date, all the telegraph company's poles, crossarms, wires, batteries, instruments, appliances and other fixtures remaining at that time on the railroad company's right of way or premises, and would hold or otherwise dispose of the same as its own property and refuse to longer permit the telegraph company to use the same for any purpose. The railroad company further gave notice that it would be compelled to make use of the telegraph company's poles and wires for telegraph business in conducting the railroad's business until the removal of the telegraph company's lines, because of the inability of the railroad company meanwhile to erect its own telegraph or telephone poles. On October 14, 1912, the Western Union Telegraph Company of New York filed its bill of complaint in the district court of the United States for the western district of Kentucky to enjoin the threatened action by the railroad company until the termination of various condemnation proceedings pending in the various States, among others by petitioner in Illi-

nois. Thereafter an injunction issued and the *status quo*
of the property has since been thereby preserved, the order
of the court issuing the injunction having been affirmed by
the circuit court of appeals for the sixth circuit. (*Louis-
ville and Nashville Railroad Co.* v. *Western Union Tele-
graph Co.* 124 C. C. A. 573.) On the 14th of November,
1912, the board of directors of the Louisville and Nashville
Railroad Company adopted a resolution which recited that
in October, 1912, the president had given instructions to
the fourth and first vice-presidents to proceed to assemble
the materials and to construct a pole line in Illinois for
carrying telephone wires thereon, and in locating the poles
to consult the signal engineer so as to facilitate the at-
tachment of electric automatic block signals, and it was re-
solved that the acts of the first and fourth vice-presidents,
and the location and selection of the company's right of
way by the engineer's department, (in Illinois on February
27, 1912,) be ratified, approved and confirmed. On the
18th day of November, 1912, the Western Union Telegraph
Company of New York entered into a written agreement
with the Western Union Telegraph Company of Illinois,
petitioner herein, whereby the Western Union Telegraph
Company of New York agreed to sell and convey to the
former all the telegraph lines and telegraph property be-
longing to it and theretofore used by it in connection with
the operation of its lines of telegraph along the line of
the Louisville and Nashville Railroad Company within the
State of Illinois. The conveyance was to be made upon
the acquisition by the petitioner, the Western Union Tele-
graph Company of Illinois, of the right to construct, main-
tain and operate lines of telegraph along the right of way
of the Louisville and Nashville Railroad Company within
the State of Illinois and upon the payment of $25,000.

The main question to be determined at the present stage
of the litigation between the parties hereto is the right of
the appellant company to bring the condemnation suit in

question under the Eminent Domain law of this State. All the reasons urged against the right of appellant to maintain its action, as embraced in the objections filed to the petition, may be divided into two general classes: (1) Those going to the validity of the law under which the suit is brought, as to one of the defendants; (2) those concerning the effect the condemnation would have on the public use of the railroad whose right of way is sought.

As to the first contention, the law allowing telegraph companies to exercise the right of eminent domain was enacted in 1874. (Hurd's Stat. 1913, p. 2419.) The first three sections of the law are as follows:

"Sec. 1. That every company heretofore incorporated under any general or special law, or which may be incorporated under any general law of this State for the construction or operation of any telegraph line through or in this State, shall possess the powers and privileges and be subject to the duties, restrictions and liabilities prescribed in this act.

"Sec. 2. Every such company may enter upon any lands for the purpose of making surveys and examinations with a view to the erection of any telegraph line, and take and damage private property for the erection and maintenance of such lines, and may, subject to the provisions contained in this act, construct lines of telegraph along and upon any railroad, road, highway, street or alley, along or across any of the waters or lands within this State, and may erect poles, posts, piers or abutments for supporting the insulators, wires and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the railroad, highway, street or alley, or interrupt the navigation of such waters.

"Sec. 3. When it shall be necessary, for the construction, alteration or repair of any line of telegraph, to take or damage any property, the same may be done and the compensation therefor ascertained and made in the manner

which may be at that time provided by law for the exercise of the right of eminent domain."

It is not pointed out in the able and exhaustive brief of counsel for appellees in what respect this law is contrary to the constitution of this State. The law has been in force many years and has received the consideration of this court. (*St. Louis and Cairo Railroad Co.* v. *Postal Telegraph Co.* 173 Ill. 508.) Similar laws have been enacted by several States of the Union, and these laws have been construed and passed upon many times, not only by the courts of last resort of those States but by the Federal courts, and the right of the law-making power of a sovereign State to enact such laws cannot be questioned. As recognized by all authorities, eminent domain is a right inherent in all sovereignties, and is defined as the right of the nation or the State, or of those to whom the power has been lawfully delegated, to condemn private property for public use, and to appropriate the ownership or possession of such property for such use upon paying the owner due compensation, to be ascertained according to law. (15 Cyc. 557.) It would seem that the above law was enacted in view of the commercial necessities of the times. The telegraph is a very important aid to business and to the welfare of the people generally. In enacting the law the legislature recognized the fact that telegraph lines would ordinarily follow the shortest routes between the centers of population,—the towns and cities,—and that such routes as were most available were at that time, and would be in the future, to some extent occupied by public roads and by railroads, and for that reason it included the provisions of the second section of the act, which permits telegraph companies to construct lines along and upon any railroad, road, highway, street, etc., in such manner and at such points as not to incommode the public use of such railroad, highway or street. Since the enactment of the law of 1874 telephones have been invented and come into general use. In 1903 the law

was amended so as to apply to telephone lines and ex-
changes.  We must decline to consider the constitutionality
of this law at this time.  The State, in its exercise of the
powers of sovereignty, having full right to enact such laws,
the only possible constitutional objection that could be urged
would be that in regard to taking or damaging private prop-
erty for public use without just compensation, and that is
not sought to be done by the petition in question.  On the
contrary, the object of the proceeding is to ascertain, by
means of a court and jury, in the manner provided by law,
the compensation to which the defendants to the petition
shall be entitled by reason of the occupancy of the railroad
right of way, and we think that this sufficiently disposes of
the objection made by appellees that the proceeding is con-
trary to the fifth amendment and to section 1 of the four-
teenth amendment to the constitution of the United States
and to section 2 of article 2 of the constitution of Illinois,
which constitutional enactments prohibit the taking or dam-
aging of private property without just compensation.

It is also urged that one of the defendant companies,
the Louisville and Nashville Railroad Company, is an inter-
State carrier engaged in the operation of a railroad in inter-
State commerce, and is not subject, because of section 8 of
article 1 of the constitution of the United States, (giving
Congress power to regulate commerce among the States,)
and laws enacted by Congress in pursuance of such consti-
tutional provision, to condemnation proceedings in a State
court.  The petition for condemnation avers, and the evi-
dence sufficiently shows, that the owner of the fee in the
right of way sought to be condemned is the Southeast and
St. Louis Railway Company, which is an Illinois corpo-
ration.  The proceeding, therefore, is one by the Western
Union Telegraph Company of Illinois, an Illinois corpora-
tion, against the Southeast and St. Louis Railway Com-
pany, also an Illinois corporation, as owner of the right of
way, and the Louisville and Nashville Railroad Company,

as lessee thereof.   No Federal law has been cited, and we are aware of none, which specifically prevents the exercise of the right of eminent domain under the sovereign powers of a State by a corporation lawfully organized and doing business under the laws of that State, against the property within that State of another corporation also organized and doing business under the laws of that State, leased to a corporation engaged in inter-State commerce.   If the contention of appellees in this respect is correct, then it would be impossible for a railroad or telegraph line, or any other corporation which would otherwise have the right of eminent domain, to condemn a right of way over or across the right of way of another railroad which might be engaged in inter-State commerce.   As there is hardly any railroad at the present day but that is engaged, to a greater or lesser extent, in inter-State commerce, the State law of eminent domain would be a nullity.   The right to so condemn in such a case has been upheld by this court in many cases and has never been questioned, so far as we are advised. Neither the Inter-State Commerce law nor any other law which has been enacted by Congress pursuant to section 8 of article 1 of the constitution of the United States, which authorizes Congress to regulate commerce among the different States, has ever been held to give Congress the exclusive jurisdiction in such matters nor to deprive the State of the power to enact suitable legislation in regard to intra-State commerce on railroads, even though such railroads may also be engaged in inter-State commerce.   In the cases of *Simpson* v. *Sheppard, Simpson* v. *Kennedy* and *Simpson* v. *Shillaber,* 230 U. S. 352 (57 L. ed. 1511,) known as the Minnesota Rate cases, it was held by the Supreme Court of the United States that the States continue to possess the right to prescribe reasonable regulations for the exclusively internal traffic on inter-State carriers after the passage of the Inter-State Commerce act of 1887 and the amendment of June 29, 1906, although it may be that by reason of

the interblending of the inter-State and intra-State operations of such carriers adequate regulation of inter-State rates cannot be maintained without imposing requirements with respect to their intra-State rates which substantially affect the former, and, as stated in the opinion in the *Simpson case,* quoting from *Escanaba Transportation Co.* v. *Chicago,* 107 U. S. 678, (27 L. ed. 442) : "But the States have full power to regulate, within their limits, matters of internal police, including in that general designation whatever will promote the peace, comfort, convenience and prosperity of their people. This power embraces the construction of roads, canals and bridges and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority. * * * When its [the State's] power is exercised so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction, * * * but until Congress acts on the subject the power of the State over bridges across its navigable streams is plenary."

It is claimed, however, that by the passage of the Federal law of July 24, 1866, Congress has assumed all power over telegraph lines engaged in inter-State commerce. The first and fourth sections of said act (U. S. Rev. Stat. 1901, sec. 3964,) are as follows:

"Sec. 1. That any telegraph company now organized or which may hereafter be organized under the laws of any State in this Union, shall have the right to construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post-roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under or across the navigable streams or waters of the United States: *Provided,* that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters or interfere with the ordinary travel on such military or post-

roads.  And any of said companies shall have the right to
take and use from such public lands the necessary stone,
timber and other materials for its posts, piers, stations, and
other needful uses in the construction, maintenance and op-
eration of said lines of telegraph, and may pre-empt and
use such portion of the unoccupied public lands subject to
pre-emption through which its said lines of telegraph may
be located, as may be necessary for its stations, not exceed-
ing forty acres for each station; but such stations shall not
be within fifteen miles of each other.

"Sec. 4.  And be it further enacted, that before any tele-
graph company shall exercise any of the powers or privi-
leges conferred by this act, such company shall file their
written acceptance with the Post-master General, of the
restrictions and obligations required by this act."

Counsel for appellees cite the case of *Western Union
Telegraph Co.* v. *Pennsylvania Railroad Co.* 195 U. S. 540,
(49 L. ed. 312,) as sustaining the contention that under
the Federal law above set out the petitioner cannot con-
demn a right of way for its telegraph line.  But such is not
the holding in that case.  On the contrary, the decision
in that case seems to hold that such right, if exercised at
all, must be under a State statute.  The main holding in
that case is, that under the congressional enactment of July
24, 1866, a telegraph company does not possess, by virtue
of that law, alone, the power to condemn a right of way
for its telegraph line on the right of way of a railroad.  In
the opinion the earlier case of *Pensacola Telegraph Co.* v.
*Western Union Telegraph Co.* 96 U. S. 1, (24 L. ed. 708,)
is referred to and explained.  In the latter case it was held
that a telegraph company organized under the laws of the
State of Florida and having by its charter the exclusive
right to construct and operate a telegraph line in certain
counties in that State, could not prevent, by injunction, an
inter-State telegraph company from erecting and maintain-
ing its line along the line of a railroad running through the

counties in question when the inter-State telegraph company had by private agreement been granted that right by the railroad company. The holding was, in brief, that the law of 1866 in effect amounts to prohibiting all State monopolies in commercial intercourse by telegraph. In the *Pennsylvania Railroad case,* which arose in the United States circuit court for the district of New Jersey, the Supreme Court, in deciding, as aforesaid, that the telegraph company had no right, under the Federal law, to exercise the right of eminent domain expressly commented upon the fact that the statute of New Jersey did not make the railroad right of way public property, so as to subject it to occupation by the telegraph company under the provisions of the Federal law of 1866, and further commented upon the fact that the statute of New Jersey did not confer the right of eminent domain upon the telegraph company. In the opinion of the court occurs the following language: "In *Postal Telegraph-Cable Co.* v. *Oregon Short Line Railroad Co.* 104 Fed. Rep. 623, and *Postal Telegraph-Cable Co.* v. *Oregon Short Line Railroad Co.* 114 id. 787, there were views expressed favorable to the contentions made in the case at bar by the telegraph company, but the judgments in both cases were ultimately rested upon the local statutes,— Idaho and Montana,—which granted the right of eminent domain to telegraph companies. We may also observe that the first case went to the circuit court of appeals of the ninth circuit. That court sustained the judgment of the circuit court upon the statute of Idaho and upon general legal principles. It did not refer to the act of 1866. (49 C. C. A. 663; 111 Fed. Rep. 843.) In *Postal Telegraph-Cable Co.* v. *Southern Railroad Co.* 89 Fed. Rep. 190, and *Postal Telegraph-Cable Co.* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 94 Fed. Rep. 234, the act of 1866 was more directly passed on. Both cases were proceedings in eminent domain,—one brought in the courts of North Carolina and removed to the circuit court of the

United States, the other brought in the circuit court of the United States for the northern district of Ohio. In passing on the sufficiency of the petition in the first case, Judge Simonton said that the right of petitioner to construct its lines along the right of way of post-roads of the United States was given under the act of Congress of 1866, but, he observed, the mode or method of exercising the right conferred was fixed by the laws of the several States, and it was exclusive in its character in ascertaining the amount of compensation to be allowed. The right of the telegraph company was therefore considered and adjudged under the North Carolina statutes. In the second case a motion was made to dismiss on the ground that the power of eminent domain was not conferred by any law of the United States or the State of Ohio. The motion was sustained." In the same case (*Western Union Telegraph Co.* v. *Pennsylvania Railroad Co.*) there was a dissenting opinion by Mr. Justice Harlan, in which he holds that the telegraph company has, by implication, the right to exercise the right of eminent domain under the congressional enactment of 1866, but it is nowhere intimated, either in the opinion of the court or in the dissenting opinion, that such companies do not have the right to exercise the right of eminent domain under State laws granting that right. On the contrary, as the excerpt from the opinion which we have set out above shows, such right seems to be fully recognized and acquiesced in. A review of the decisions in other Federal cases cited in the opinion will show that such rights have been recognized and passed on by such courts under the eminent domain laws of the States of Idaho, Montana, North Carolina and Ohio, and similar State statutes involving the right of a telegraph company to condemn a railroad right of way under eminent domain have been involved in the following cases, and in each case, although the railroad opposed the right of the telegraph company to condemn, the telegraph company was successful and in none of them was

the question of the unconstitutionality of the State law intimated: *St. Louis and Cairo Railroad Co.* v. *Postal Telegraph Co. supra; Union Pacific Railroad Co.* v. *Colorado Postal Telegraph-Cable Co.* 30 Col. 133; *Savannah, Florida and Western Railway Co.* v. *Postal Telegraph-Cable Co.* 112 Ga. 941; *Mobile and Ohio Railroad Co.* v. *Postal Telegraph-Cable Co.* 120 Ala. 21; *Railroad Co.* v. *Telegraph Co.* 101 Tenn. 62; *Mobile and Ohio Railroad Co.* v. *Postal Telegraph-Cable Co.* 76 Miss. 731; *Postal Telegraph-Cable Co. of Louisiana* v. *Morgan's L. & T. R. & S. Co.* 49 La. Ann. 58; *Postal Telegraph-Cable Co. of Louisiana* v. *Louisiana Western Railway Co.* 49 La. Ann. Rep. 1270; *Postal Telegraph-Cable Co. of Utah* v. *Oregon Short Line Railway Co.* 23 Utah, 474; *Postal Telegraph-Cable Co.* v. *Southern Railway Co. supra; Postal Telegraph-Cable Co. of Idaho* v. *Oregon Short Line Railroad Co. supra; Postal Telegraph-Cable Co. of Montana* v. *Oregon Short Line Railroad Co. supra; Postal Telegraph-Cable Co.* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co. supra.*

In the recent case of *Louisville and Nashville Railroad Co.* v. *Western Union Telegraph Co. supra,* decided by the United States circuit court of appeals of the sixth circuit, which was a suit to enjoin a condemnation suit instituted by the Western Union Telegraph Company of New York against the Louisville and Nashville Railroad Company under a statute of the State of Kentucky which allows foreign telegraph companies to exercise the right of eminent domain, the court expressly held that the Kentucky statute was not invalid as attempting to regulate inter-State commerce. The Illinois statute, when properly enforced in such cases, would not conflict with the Inter-State Commerce law, as the right of telegraph companies to condemn is subject to the provision that such condemnation shall not incommode the public use of the railroad, and when the condemnation is made in such manner the railroad will not be incommoded in its public use as an inter-State carrier

or otherwise. In *Western and Atlantic Railroad Co.* v. *Western Union Telegraph Co.* 138 Ga. 420, the Supreme Court of Georgia held that a telegraph line so constructed and maintained as not to interfere with the transportation of passengers and goods beyond the State is not a burden on inter-State commerce.

There is another point that remains to be considered in connection with the possible conflict that may arise between State and Federal jurisdiction by permitting the petitioner to condemn the right of way to the center thread of the permanent stream of the Wabash river. By the act of Congress of April 18, 1818, enabling the people of Illinois to form a constitution and State government and fixing the boundaries of the State, the south-eastern boundary was fixed as beginning at the mouth of the Wabash river, thence up the same, etc. It was further provided in that act that the State of Illinois should have concurrent jurisdiction with the State of Indiana on the Wabash river so far as said river shall form a common boundary to both, and also concurrent jurisdiction on the Mississippi river with any State or States to be formed west thereof, so far as said river shall form a common boundary to both. The constitutions of Illinois of 1818, 1848 and 1870 have followed the enabling act of Congress in establishing these boundaries, and it has been held that when the middle of a navigable river becomes the boundary line between two States, the middle of the current or channel of commerce will be regarded as the boundary line. (*Keokuk and Hamilton Bridge Co.* v. *People,* 145 Ill. 596; *Iowa* v. *Illinois,* 147 U. S. 1; 37 L. ed. 55.) The phrases "middle of the river" and "middle of the main channel" are equivalent expressions and both mean the main line of the channel, or, as it is frequently expressed, the middle thread of the current. (*Buttenuth* v. *St. Louis Bridge Co.* 123 Ill. 535.) There is no doubt that the Wabash river is a navigable river, and as such it is under the control of the United States, and

it is not within the power of a State to interfere with such control or navigability. The congressional enactment of 1866 regarding telegraph lines, which we have heretofore set out, expressly gives telegraph lines the right to cross navigable rivers in the United States in such way as shall not interfere with the navigability thereof, and it appears from the evidence in this case that the petitioning telegraph company has accepted the provisions of that act and such acceptance has been approved by the Post-master General of the United States. Petitioner only seeks to construct the proposed telegraph line across any lands or waters within this State in accordance with the laws of this State and in such manner as will not interrupt the navigation of such waters. All that petitioner seeks to do by its petition is to condemn a right of way within the regular boundaries of the State of Illinois, which it has full right to do if it has any right to condemn at all, and if granted that right by the courts of this State it will only be such right as the State could give, and would be no protection to the petitioner in anything it might do which would involve conflict with the authority of the Federal government over the Wabash river. For these reasons we do not think the objection well taken.

There were other objections which are the subject of cross-errors of the appellee companies, as to the sufficiency of the petition, the description of the portion of the right of way sought to be condemned, and the failure to agree on compensation. These questions have received the consideration of this court in the case of *St. Louis and Cairo Railroad Co.* v. *Postal Telegraph Co. supra,* in which it was held that the petition there considered, which was very similar to the petition in the case at bar, was sufficient. As is stated in the opinion: "To locate each pole by an individual description, so as to designate by metes and bounds the exact spot of earth occupied by each, would require the insertion in the petition of 4500 separate descriptions. The

very statement of such a proposition shows its unreason-
ableness." It was also held in that case that it was not
necessary to file a plat of the location of the proposed line
of telegraph. The court further held that where an offer
has been made by the telegraph company for the use of the
right of way, and the owner, as was shown by the petition
in this case, refuses to sell, there is sufficient showing of a
failure to agree on the compensation.

It is further objected that the petitioning company is
neither a *de jure* nor *de facto* corporation, and that it is
acting collusively and fraudulently with the Western Un-
ion Telegraph Company of New York. The incorporation
proceedings are regular on their face and the petitioner is
regularly organized and in a position to transact the busi-
ness and exercise the powers for which it was organized.
If it has been organized in an unlawful manner or for an
unlawful purpose, even if there were evidence to that ef-
fect, it could not be considered in a collateral proceeding.
*Brown* v. *Calumet River Railway Co.* 125 Ill. 600, and
cases cited.

It remains to consider the second series of objections to
the petition which were sustained by the court below, that
the construction and operation of the telegraph line would
incommode the public use of the railroad, that appellees
had the preferential right to the construction of a tele-
graph line in the interest of the public, and that property
already devoted to public use cannot be condemned for an-
other public use.

The appellees introduced a large amount of evidence as
tending to show that a telegraph line along the right of
way of a railroad company is a serious detriment to the
operation of the railroad, and there was a large amount of
evidence offered on behalf of appellant to the effect that
a telegraph line would not interfere with or incommode
the public use of the railroad. It appears from the notice
served upon the Western Union Telegraph Company of

New York by appellee the Louisville and Nashville Railroad Company to remove the poles and wires already there, that the railroad company attempted to reserve the right to use such poles for its own telegraph signal purposes until it could erect its own line of poles on the right of way. We can only infer from the evidence that a telegraph system built in substantially the same manner as the system proposed to be erected by appellant has been and is now, and will be for many years, in use on the right of way in question. In fact, it appears from the evidence that a telegraph line has been on the right of way for some forty years, and it is in keeping with our common observation and knowledge of such matters that a telegraph line is necessary to the proper operation of any railroad system and that such telegraph line on the right of way does not incommode the public use of a railroad. In *St. Louis and Cairo Railroad Co.* v. *Postal Telegraph Co. supra,* it was held that two telegraph lines would not incommode the public use of a railroad with a right of way similar to the one in this case. At the present time the Western Union Telegraph Company of New York has strung on its poles and has devoted to the use of the railroad company two wires, which are apparently sufficient for its needs. By an amendment to its petition the petitioning company has offered as follows: "That petitioner does not seek hereby to acquire the space occupied, at the time of the filing of the petition herein, by any wire or wires on the said railroad right of way which the said defendant railroad company at such time may have owned or operated; and petitioner represents, offers, stipulates and agrees that it will accommodate, carry and support upon petitioner's said proposed telegraph-pole line such wire or wires as the said railroad company, at the time of the filing of the petition herein, owned or operated upon said railroad right of way and such additional telegraph or telephone wires as may thereafter be needed by said railroad company in the conduct of

its business, and afford to said railroad company like bene-
fits and advantages, in respect to position and operation of
all of said wires, as said railroad company enjoyed at the
time of the filing of the petition herein." The petitioner had
a right to amend its petition and thereby limit the charac-
ter of the easement sought to be condemned. The reason
for making the amendment was, that it developed on the
trial that the Louisville and Nashville Railroad Company
had, by permission or license from the Western Union Tele-
graph Company of New York, strung a telephone wire and
some signal wires for short distances at certain places on
the poles of the telegraph company, which were in use in
operating the road. The court below had also announced
its finding that one of the wires of the Western Union sys-
tem was the property of the railroad company, and it was
therefore considered that the telegraph line was jointly
owned and operated by both the railroad and telegraph
companies, and the railroad company had in use and oper-
ation a telegraph line necessary for its own use along the
right of way in the identical place sought to be condemned
by the petitioner. We think the holding of the trial court
as to the ownership of the wire in question was erroneous.
It appears from the evidence that in 1884 the Western
Union Telegraph Company of New York had installed and
was the owner of a complete telegraph system along the
line of the Louisville and Nashville railroad. That year a
contract was made whereby the Western Union set apart
one of the wires of the system so installed and owned by
it, for the use of the railroad company. It was provided
in the contract "that if the railroad company shall at any
time require greater wire facilities on any portion of its
road than herein provided, the telegraph company will fur-
nish an additional wire at the cost price thereof upon its
poles, or the railroad company may at its own cost string
said additional wire upon the telegraph company's poles in
such manner and position as it may direct." The contract

further provided that the telegraph lines and wires covered by the contract shall form part of the general system of the telegraph company.   Had the railroad company exercised its right, under the contract, to "at its own cost string such additional wire upon the telegraph company's poles in such manner and position as it may direct," there would be some reason for holding that such wire belonged to the railroad company.   The evidence shows that when the railroad company desired another wire it requested the telegraph company to furnish and string the wire.   Such wire was only a part of the accommodation furnished.   The telegraph company furnished with it support from its poles and cross-arms, electric current from its batteries and the necessary connections, and other things which made the wire part of the entire system and which were much greater than the cost of the wire when placed on the company's poles.   The effect of the contract and the transaction consummated pursuant thereto was, that the telegraph company added an additional wire to its system and the railroad company paid a certain price for its use.   At the time of filing the suit the contract between the Western Union Telegraph Company of New York and the Louisville and Nashville Railroad Company had been terminated by notice duly given as provided, and subsequently the railroad company gave the Western Union notice to remove all its poles, wires and other property from the railroad right of way, and they have only been kept there since by the injunction of the United States district court.   It is doubtless true that the railroad company has a right to construct a telegraph line as a necessary part of the equipment with which to operate its road.   It is also true that if the railroad company had constructed such line the petitioner could not, by condemnation, take the identical location occupied by the railroad company, to the injury of the latter.   This it is not seeking to do.   The statute gives the petitioner the right to condemn along and upon the right of way of the appellees.

There is a difference between damaging the railroad and incommoding the public use of the road. The statute giving the right to condemn assumes that there will be damage suffered by the railroad company whose property is taken, and provides how such damage may be ascertained and compensation allowed by a jury. The only difference between railroads and public roads and other premises in condemnation proceedings is, that the telegraph company shall erect its poles, posts, etc., "in such manner and at such points as not to incommode the public use of the railroad, highway, street," etc. The petition sufficiently avers that the proposed system shall be constructed in such manner as not to incommode the public use of the railroad. The public use of the railroad means the ordinary use to which the railroad is put, as a common carrier, in transporting passengers and freight. Such use requires two lines of telegraph wire along the road and some few telephone and signal wires at some points. The petitioning company agrees to so install and construct its system that all these appliances necessary for the railroad in its public use shall not be interfered with, or, in other words, in such manner that the railroad shall not be incommoded in its public use. With the wisdom of the law which gives telegraph companies the right to condemn we have nothing to do. It is only within the power of the courts to say whether or not the petitioner has brought itself within the law so that it is entitled to condemn. *South Park Comrs.* v. *Ward & Co.* 248 Ill. 299; *Chicago, Rock Island and Pacific Railroad Co.* v. *Town of Lake,* 71 id. 333.

So far as the railroad company seeks to retain the present location of the telegraph line for its own telegraph line for commercial purposes it cannot claim a preferential right. In such case it is the same as any other company and can claim no preferential right, and the preference is to be given, in condemnation proceedings, to the one who first locates the line which is in dispute. (*Golconda Northern*

*Railway* v. *Gulf Lines Connecting Railroad of Illinois*, 265 Ill. 194, and cases there cited.) The evidence in this case shows that the line of the petitioning company was located January 12, 1912. The same line was not located by the railroad company until February 27, 1912. Under the circumstances, therefore, if the railroad company refuses to accept such stipulation or opposes the condemnation on the terms offered by the petitioner, which it has full right to do, it will be in no position to complain that it is incommoded in the business use of its road, where such incommoding is caused by its own acts. By the petition as amended the petitioner offers, as a condition to being granted the right to condemn, to do certain things. If these things are done the road will not be incommoded in its public use. The amendment to the petition was more than an offer or stipulation that had to be accepted by the appellees to become of binding force and effect. It limited the character and nature of the easement sought. It is the same as if a railroad company sought to condemn a right of way over the right of way of another railroad. If a petitioning company offered to construct an overhead or an underground crossing so as not to interfere with the operation of another road, it would be so limited in the judgment of the court and damages would be recoverable on that basis. It would not be allowed a judgment for a grade crossing. In *St. Louis and Cairo Railroad Co.* v. *Postal Telegraph Co. supra,* this court held that allegations in the petition as to the offer of the petitioning company to move its poles in case the railroad company should in the future lay down another track or erect certain structures on the right of way were valid and binding, citing *Chicago and Alton Railroad Co.* v. *Joliet, Lockport and Aurora Railway Co.* 105 Ill. 388, and *Peoria and Pekin Union Railway Co.* v. *Peoria and Farmington Railway Co.* 105 id. 110. In *Eldorado, Marion and Southwestern Railroad Co.* v. *Sims,* 228 Ill. 9, this court said: "It is not uncommon, in condemnation

proceedings to acquire property for right of way purposes, to permit the party seeking to condemn, to stipulate as to the manner in which the land shall be used, or that the party seeking to condemn will perform certain things connected with or upon the land, such as fencing the right of way, erecting crossings, putting in culverts, underground passageways, etc. We think the right to make stipulations upon the part of the condemning party which do not affect the rights of the public by rendering the right of way sought to be acquired unsafe to the traveling public for use for railroad right of way purposes, and which tend to lessen the damages to the land owner, is in conflict with no rule of public policy." It is the nature of the easement which is sought to be condemned that distinguishes the case at bar from the case of *Western and Atlantic Railroad Co.* v. *Western Union Telegraph Co.* 138 Ga. 420, relied upon by appellees. In that case the Western Union Telegraph Company operated its telegraph system on two lines of poles,—one line on each side of the track of the railroad company. The telegraph company was operating its lines under a contract with the railroad company, which was apparently the same contract heretofore referred to, dated June 18, 1884, and which ran from July 1, 1884, and was to continue for twenty-five years, and thereafter until one year after notice by either party to terminate the contract. The telegraph company served notice on the railroad company of its intention to terminate the contract, and commenced proceedings, under the statute, to condemn a right of way for its line along the right of way of the railroad company on both sides of the railroad track and along the same location on one side of the track claimed by the railroad company as necessary to maintain a telegraph line for the operation of its road. The railroad company had at its own expense strung certain wires on the poles of the telegraph company for its exclusive use in operating its railroad and was using said wires at the time of the con-

demnation proceeding. There was no limitation in the character of the easement sought to be condemned, as in the case at bar, and had the petition to condemn been granted, the railroad company would have been deprived of its telegraph lines as they were located and compelled to construct a telegraph system necessary to operate its road on some other part of its right of way and subject to the prior location of the telegraph company. Under these circumstances the court said in the opinion in that case: "These conflicting claims must be solved by the rule that property dedicated to one public use cannot be subjected to another public use except in cases where the latter use does not materially interfere with the former." The court further held that while the railroad company has a preferential selection of the portion of the right of way upon which to construct and operate its own telegraph line necessary for the proper operation of said road, a telegraph company may condemn a right of way on and along the right of way of a railroad company when the proposed line of telegraph will be so constructed as to produce no material interference with the railroad company's free exercise of its franchise or with the actual operation of the railroad. In that case the court also held that a railroad company cannot defeat the exercise of the right of eminent domain by a telegraph company in constructing a line of telegraph on a portion of its right of way, by the construction and maintenance of a line on both sides of its track when a line on one side of its track is ample to furnish it with necessary telegraph service. It was further held in that case that a telegraph company will not be permitted to condemn the right of way of a railroad company for the construction and maintenance of its line of telegraph in such a manner as to materially interfere with the railroad company in the operation of its trains and in the transportation of passengers and goods.

Another contention of appellees is that appellant is seeking to condemn for its purposes property already occupied

and subjected to the same use, and that it has a preferential right to construct a telegraph system where the present system of the Western Union Telegraph Company of New York is now located. In the case at bar the most that appellees claim in the way of property subject to another use for telegraph purposes is one wire strung on poles not owned by appellees and supplied by an electric current not furnished by appellees. The space occupied by this wire, without the poles, cross-arms, insulators and other accessories of the Western Union Telegraph Company of New York, is all that can be claimed by appellees that will be taken, and that has been eliminated by the amendment to the petition to condemn. In all prior cases which have arisen in which was involved a condemnation of property already subjected to another public use, there has been some tangible, appreciable property involved. A condemnation proceeding under the Eminent Domain act is for the purpose of taking property. In this case appellees own no telegraph line or property of that nature that will be taken. It is necessary to keep in mind that the only questions in this case arise from the fact that appellant is a telegraph company seeking to condemn a portion of the right of way of appellees, which are railroad companies. It is true that the portion of the right of way sought to be condemned is occupied by the Western Union Telegraph Company of New York. That company is not a party to the suit, nor can it be said to be acting in collusion with appellant when appellant is doing exactly what the law authorizes it to do and the only thing it can do. There has been no attempt to conceal the facts or the relations between appellant and the Western Union Telegraph Company of New York. The fact that appellant has made an arrangement with the Western Union Telegraph Company of New York to buy its poles and wires, etc., furnishes no reason for saying that such acts are unlawful or in any way improper, nor can appellees truthfully claim that they have been in any way

hampered or prevented from exercising any rights which they may have exercised in the premises by reason of their contract with the Western Union Telegraph Company of New York. It is very plain from the record that from the time notice was first given to cancel the contract existing between the Western Union Telegraph Company of New York and appellees, the latter, with full knowledge of all the facts and circumstances, have had full opportunity to take such action as their officers saw fit, and they did take all steps that they considered necessary. While it is true the petition to condemn was originally filed prior to the termination of the contract and after notice was given to terminate such contract, appellant has gained no advantage thereby. The injunction obtained from the Federal court by the Western Union Telegraph Company of New York, restraining appellees from removing the poles and wires of the New York company from the right of way of appellees, was not issued until November, 1912, while the contract was terminated pursuant to notice the preceding August.

For the reasons given, we think the case should have gone to a jury on the petition, as finally amended, to fix the damages.

The judgment of the county court of St. Clair county is affirmed in so far as it overruled the objections to the petition and amended petition and is reversed in so far as it sustained the objections to the petition and amended petition, and the cause will be remanded to that court, with directions to overrule all objections sustained, and for further proceedings in accordance with the views herein expressed.

*Reversed in part and remanded, with directions.*

COOKE, J., FARMER, C. J., and DUNN, J., dissenting:

In order to make our position clear we will re-state the facts, so far as we consider them material to a decision of the case, as follows: In 1884 the Louisville and Nashville Railroad Company and the Western Union Telegraph

270 — 28

Company, a corporation organized under the laws of the State of New York, entered into a written contract whereby the railroad company granted to the telegraph company for a term of twenty-five years the exclusive right to construct and maintain telegraph lines upon the rights of way owned or controlled by the railroad company during the existence of the contract. It was further provided that after the expiration of twenty-five years the contract should continue in force until the expiration of one year after written notice should be given by one of the parties to the other of an intention to terminate the same. The telegraph company, among other things, agreed to set apart one wire for the preferential use of the railroad company, and further agreed that if the railroad company should at any time require greater wire facilities on any portion of its road the telegraph company would furnish an additional wire for the railroad company at the cost price thereof upon its poles, or the railroad company might at its own cost string such additional wire upon the telegraph company's poles in such manner and position as the telegraph company might direct. In 1901 the telegraph company, at the request of the railroad company, strung an additional wire for the railroad company upon its poles, and the cost thereof, amounting to $3820.61, was paid by the railroad company. This wire has ever since remained upon the poles of the telegraph company and has been used exclusively by the railroad company.

On August 17, 1911, the telegraph company served notice upon the railroad company that it would on August 17, 1912, terminate the contract above mentioned. On October 5, 1911, the Western Union Telegraph Company of Illinois was organized under the laws of this State with a capital stock of $25,000, for the purpose of owning, constructing, maintaining and operating lines of magnetic telegraph in the State of Illinois. The subscribers to the capital stock were all officers or employees of the Western

Union Telegraph Company of New York, and their subscriptions to the capital stock were paid by the Western Union Telegraph Company of New York. These nominal stockholders of the Illinois corporation elected themselves directors, and chose one of their number, who was then superintendent and is now general manager in Chicago of the Western Union Telegraph Company of New York, as president of the new company. The post-office address of the business office of the new corporation was fixed at 111 West Jackson boulevard, in the city of Chicago, which is the Chicago address of the Western Union Telegraph Company of New York. It also appears from the record in this case that on October 11, 1911, the executive committee of the board of directors of the Western Union Telegraph Company of New York adopted the following resolution:

"Whereas, the executive committee has heretofore authorized the termination of our contract with the Louisville and Nashville Railroad Company and has authorized the condemnation of rights of way over the railway lines of the Louisville and Nashville railroad system; and whereas, in order to effect this object it may be desirable to acquire interests in the capital stock of other corporations organized for telegraph purposes; and whereas, under authority of the president $25,000 has been heretofore expended for that purpose in Illinois:

"*Resolved*, that such expenditures so made by authority of the president is hereby approved; and further, that the president is hereby authorized and empowered to make such other and further expenditures as in his judgment, from time to time, may be necessary in order to effect such condemnation of rights of way as aforesaid."

Thereafter, on December 13, 1911, the following proceedings were taken by the board of directors of the Western Union Telegraph Company of New York, as shown by the minutes of a meeting of the board: "President authorized to make such expenditures as in his judgment, from time to time, may be necessary to effect condemnation of rights of way along the Louisville and Nashville

system, including an initial expenditure of $25,000 for that purpose in Illinois."

In November, 1911, the charter of the Louisville and Nashville Railroad Company was amended, and the railroad company, in addition to the powers conferred upon it by its original charter, was thereby authorized to construct and operate telegraph and telephone lines, not only for use in operating its railroad, but also for the purpose of serving the public as a common carrier of messages.

On January 12, 1912, the president of the Western Union Telegraph Company of Illinois, who was also the general superintendent in Chicago of the Western Union Telegraph Company of New York, directed the district foreman of the Western Union Telegraph Company of New York to locate a telegraph-pole line for the Western Union Telegraph Company of Illinois along the right of way of the Louisville and Nashville Railroad Company in Illinois, and to locate such line practically on the same line then occupied by the poles and wires of the Western Union Telegraph Company of New York. These instructions were carried out and the line was located on the south side of the railroad right of way and followed the line then occupied by the poles and wires of the Western Union Telegraph Company of New York. On January 31, 1912, the Western Union Telegraph Company of Illinois made a formal offer to the railroad company of five dollars per mile for an easement for a pole line upon the railroad right of way. This offer was refused. On February 1, 1912, the railroad company began the location of proposed telegraph-pole lines along the rights of way embraced in its railroad system. This system extends through thirteen States and includes about 5000 miles of rights of way, of which only 179 miles are within this State. The work of locating the telegraph lines was begun at Union, Tennessee, and was continued, without interruption, until and including February 27, 1912, on which date the location of the line upon

the right of way in Illinois was completed.   In the mean-
time, on February 3, 1912, the Western Union Telegraph
Company of Illinois filed its petition in the county court of
St. Clair county, as hereinbefore stated, to condemn a right
of way for a telegraph-pole line upon and along all the
right of way of the railroad company in this State.   The
petition, as finally amended, alleged that the petitioner had
located its proposed telegraph line upon the right of way
of the railroad company; that the line would be constructed
of the best material and upon the most approved plans, on
the southerly side of the railroad right of way, not less
than seven feet from the nearest rail of the main line of
the railroad, and that the poles would be so erected and
the line so constructed and maintained as not to obstruct
or interfere with the business or use of the railroad.   It
was further alleged that the petitioner does not seek to ac-
quire the space occupied, at the time of the filing of the
petition, by any wire or wires on the right of way which
the railroad company at such time may have owned or
operated, and the petitioner offered to accommodate, carry
and support upon the proposed poles such wire or wires
and such additional telegraph or telephone wires as might
thereafter be needed by the railroad company in the con-
duct of its business.   It also appeared upon the hearing
below that the pole line now on the railroad right of way
is located at the extreme outer edge of the right of way
and as far from the railroad tracks as it is possible to con-
struct a line on the right of way.   The width of the right
of way varies from 25 feet to 250 feet, the average width
being a little less than 100 feet.

On August 5, 1912, the railroad company notified the
Western Union Telegraph Company of New York that on
and after August 17, 1912, (that being the date fixed by
the notice from the telegraph company to the railroad com-
pany for the termination of the contract under which the
telegraph company maintained its telegraph line upon the

railroad right of way,) the use and occupation of the railroad right of way by the telegraph company would be without the permission or consent of the railroad company, and that unless the poles, wires and other property of the telegraph company were removed by December 1, 1912, the railroad company would take possession of all such property and use or dispose of the same as its own property. Thereupon the Western Union Telegraph Company of New York obtained an injunction in the district court of the United States for the western district of Kentucky restraining the railroad company from taking action in accordance with its said notice until the termination of the condemnation proceedings then pending in various States, including Illinois. The evidence further discloses that on November 18, 1912, a contract was made between the Western Union Telegraph Company of New York and the Western Union Telegraph Company of Illinois whereby the former company agreed to convey, transfer, assign and set over to the latter company all the telegraph lines and property belonging to it along and upon the right of way of the Louisville and Nashville Railroad Company within the State of Illinois, upon the acquisition by the Illinois corporation of the right to construct, maintain and operate telegraph lines along such right of way and upon the payment of $25,000 to the Western Union Telegraph Company of New York.

As we view the case it is necessary to consider but two of the grounds relied upon by appellees in support of the judgment of the county court: First, that the railroad company has a preferential right to locate a telegraph line upon and along its right of way; and second, that appellant is seeking to condemn property for a telegraph-pole line which is already devoted to the same public use.

The authority of a telegraph company to condemn a right of way for a telegraph line upon and along a railroad right of way is conferred upon domestic corporations

by an act entitled "An act to revise the law in relation to
telegraph companies," approved March 24, 1874, in force
July 1, 1874. (Rev. Stat. 1874, chap. 134.) This statute
does not confer upon a telegraph company the unlimited
power to condemn a right of way for a telegraph line up-
on and along a railroad right of way, but it is only when
the construction and maintenance of the proposed telegraph
line will not "incommode the public use of the railroad"
that such right of way can be obtained by condemnation.
The statute thus clearly recognizes that the railroad com-
pany has a preferential right to the use of its right of way
for railroad purposes, and only confers upon telegraph
companies power to take a portion of the railroad right
of way for the construction of a telegraph line when there
is no reasonable necessity for the use of such portion by
the railroad company in the operation of its railroad. The
evidence in this case shows, and it is a matter of common
knowledge, that a telegraph or telephone line is essential
to the safe and proper operation of a railroad. The rail-
road company therefore has a right to use such portion of
its right of way as may be necessary or suitable for the
construction and maintenance of a telegraph or telephone
line, and that it may construct its own pole line and re-
fuse to accept an offer to string its wires upon the poles of
another company is in our opinion too clear to admit of
argument.

The only description in the petition of the right of
way sought to be condemned is, that it is located on the
southerly side of the railroad right of way and not less
than seven feet from the nearest rail of the main line of
the railroad. There is a further allegation in the petition
that the line will be constructed "upon the most approved
plans," and evidence was introduced by appellant tending to
show that the words quoted are well understood in tele-
graph line construction as meaning, among other things,
that the line is to be constructed as far as possible from

the nearest rail of the main line of the railroad. Such location would be the same as that now occupied by the line of the Western Union Telegraph Company of New York, and it is conceded by appellant that the portion of the railroad right of way which it seeks to condemn in this proceeding is practically identical with that upon which the line of the Western Union Telegraph Company of New York is now located. The railroad company has also located the line which it proposes to construct, when the poles and wires of the Western Union Telegraph Company of New York shall be removed, upon the same line. Appellant filed its petition for condemnation before the railroad company actually located its proposed line upon the right of way in controversy, and contends that it therefore has the prior right to take this portion of the railroad right of way for the construction of its telegraph line. The railroad company, however, had long prior to the filing of the petition herein acquired its right of way by contract with the Southeast and St. Louis Railway Company, and had a right, when the occasion arose, to construct and maintain a telegraph-pole line upon that right of way. Instead of exercising that right itself, it in 1884 contracted with the Western Union Telegraph Company of New York to construct and maintain telegraph-pole lines upon its rights of way and to furnish it the telegraph service then considered necessary to operate the railroad, and by this contract obtained the further right, in case it should become necessary, to string an additional wire of its own upon the poles of the telegraph company. This arrangement obviated the necessity of the railroad company constructing its own pole line upon its right of way during the existence of this contract. On August 17, 1911, the telegraph company, in accordance with a provision of the contract, served notice upon the railroad company that the contract under which it was maintaining the telegraph line upon the railroad right of way and furnishing telegraph service to the rail-

road company for the operation of its railroad would be terminated on August 17, 1912. Until the date fixed by the telegraph company for the termination of the contract no occasion would arise for the construction of a telegraph or telephone line by the railroad company upon its right of way or for the erection of poles to support its wires which were strung upon the poles of the telegraph company. Upon the termination of the contract the railroad company had a preferential right to the use of any particular portion of its right of way for a telegraph line, provided there was a *bona fide* intention on its part to construct such a line upon that particular portion of its right of way upon the termination of the contract or within a reasonable time thereafter. Appellant did not wait until the termination of the contract before filing its petition to condemn, but more than six months before the railroad company was under any obligation to begin the construction of its own line in order to preserve its preferential right to the use of that portion of its right of way for such purpose appellant sought to condemn that portion of the right of way which was most available for a telegraph-pole line and which was then being used by the Western Union Telegraph Company of New York and the railroad company, jointly, for a telegraph line. The evidence clearly shows that it was the *bona fide* intent of the railroad company to construct its own line upon this particular portion of its right of way when the poles of the Western Union Telegraph Company of New York should be removed.

The fact that appellant located its line and filed its petition for condemnation before the railroad company actually located the line upon which it proposed to construct its own telegraph line upon the termination of the contract with the Western Union Telegraph Company of New York does not give appellant the prior right to take that portion of the right of way which it seeks to condemn for a telegraph line. The mere filing of the petition by a company

seeking to condemn property for a public use does not give it priority over another corporation which has previously obtained by contract the same property for the same use. In *Atlanta, Knoxville and Northern Railway Co.* v. *Southern Railway Co.* 131 Fed. Rep. 657, it was said: "The only right which can be said to result from mere priority of time in the institution of such a proceeding is an equitable right of priority over a later effort to acquire the same property for a like purpose, whether by a like proceeding or contract with notice, actual or constructive. * * * Mere priority of right accorded to one petitioner over another upon the ground of priority in time should not have any retrospective operation, so as to give precedence over an earlier acquisition of the same right of way by contract."

In *Western and Atlantic Railroad Co.* v. *Western Union Telegraph Co.* 138 Ga. 420, the Supreme Court of Georgia, in considering the relative rights of the railroad company and the telegraph company where the latter had been occupying a portion of the railroad right of way under contract but had terminated the contract and was seeking to condemn a portion of the railroad right of way for telegraph lines, said: "The railroad company contends that it should have the right of prior selection in the location of a line of telegraph for railroad use, and that it intends to erect poles upon substantially the same location as at present occupied by those of the telegraph company. On the other hand, the telegraph company denies that the railroad company has any such right, but asserts that it has the right to select a route over the railroad company's right of way at any point which does not materially interfere with the railroad company in the conduct of its business. These conflicting claims must be solved by the application of the rule that property dedicated to one public use cannot be subjected to another public use, except in cases where the later use does not materially interfere with

the former.   If the railroad company owned the existing line of telegraph and it was necessary to maintain and have it for the safe and convenient handling of its trains and cars, no one would seriously contend that the telegraph company could deprive the railroad company of its use by virtue of the exercise of the right of eminent domain.   Assuming, of course, the necessity of a line of telegraph as auxiliary to the operation of a railroad company, the railroad company would have the same right in locating its telegraph lines as it would have in locating its railroad track or its depot and its warehouses on its own right of way.   If a railroad company was originally constructing its track, could it be said that a telegraph company could arbitrarily select sites for its poles, so as to force the railroad company to build its tracks on a less desirable place on its right of way?   Surely not.   The fundamental basis of the principle of subjecting one public use to a second public use is that the first use must not be materially interfered with.   It would, indeed, be a most unfair demand to make of the owner of property charged with the discharge of a public duty that he must make his property subservient to the convenience of the demandant, who desires it for another public use.   The railroad company is held off, by its contract, from constructing its line of telegraph on that portion of its right of way which it prefers, and which it has selected, until the contract expires, and the telegraph company should not be given a preference because it is not fettered by the same contract in proceeding to condemn the same portions of the railroad right of way."   This case is almost identical with the case at bar, and the reasoning of the Georgia court seems to us, upon legal principles, to be unanswerable.   We do not agree with the majority that this case can be distinguished from the case at bar.

In our judgment the authorities upon this subject, as well as reason, support the contention that the railroad company in the case at bar has a preferential right to con-

struct its telegraph line upon that portion of its right of way which appellant seeks to condemn.

Another insuperable obstacle to granting the prayer of the petition for condemnation is, that at the time the petition was filed the property sought to be taken was devoted to the same public use for which appellant seeks to condemn it. This court has frequently held that property devoted to a public use cannot be condemned by another for the same public use. (*Lake Shore and Michigan Southern Railway Co.* v. *Chicago and Western Indiana Railroad Co.* 97 Ill. 506; *St. Louis, Alton and Terre Haute Railroad Co.* v. *Belleville City Railway Co.* 158 id. 390; *Suburban Railroad Co.* v. *Metropolitan West Side Elevated Railroad Co.* 193 id. 217.) As a result of the conclusion reached by the majority, appellant will obtain a judgment permitting it to enter upon the right of way, upon the payment of the compensation to be awarded the railroad company, and erect its poles at the identical places where the poles of the present line are located and string its wires in the same spaces that the present wires are strung. In fact, it appears to be the purpose of appellant to take over the poles, wires and fixtures of the Western Union Telegraph Company of New York on the railroad right of way instead of constructing a new line. It is true that the Western Union Telegraph Company of New York is not asserting its right, by reason of prior occupancy, to this portion of the railroad right of way until the termination of its contract, in opposition to appellant's petition to condemn. The reason why that company is not only not resisting the petition to condemn but has by contract since the filing of the petition herein shown its willingness to surrender its right of way to appellant is obvious. Appellant was organized by the Western Union Telegraph Company of New York for the express purpose of obtaining a right of way for a telegraph line upon the railroad right of way by condemnation, a foreign corporation having no power to obtain such right

of way by condemnation, and the Western Union Telegraph Company of New York is the beneficial owner of all of appellant's capital stock. The Western Union Telegraph Company of New York was not, however, at the time of the filing of the petition, the only party interested in the telegraph line located on the railroad right of way. The railroad company was also interested to the extent that it was, under its contract with the Western Union Telegraph Company of New York, entitled to demand that that company maintain its line of poles and wires on the railroad right of way until the termination of the contract, in order that it might be able to perform the duties and obligations owing by it to the railroad company under the terms of that contract. The Western Union Telegraph Company of New York should not be permitted to relieve itself from the performance of those duties and obligations nor deprive the railroad company of its preferential right to construct its own telegraph line upon the most desirable portion of its right of way upon the termination of the contract by consenting to the condemnation of the property upon which its line is located or by failing to object to such condemnation. Under such circumstances the railroad company has such an interest in the existing telegraph line as entitles it to urge as an objection to appellant's petition that the property sought to be taken was at the time of filing the petition, and is now, devoted to the same public use for which it is sought to be taken.

The majority opinion holds that the amendment to the petition merely limited the character of the easement sought to be condemned. This we consider to be manifestly erroneous. The evidence disclosed that the railroad company, at the time of the filing of the condemnation petition, was using the identical portion of the right of way for the same purpose for which it was sought to be condemned. That was fatal to appellant's petition, and in an attempt to obviate this objection it proposes the joint use of that portion

of the right of way by the railroad company and the tele-graph company for a pole line; and the majority opinion holds that the railroad company must either accept this of-fer or remove its wires from that portion of its own right of way. In support of the proposition that this amendment was more than an offer or stipulation, in that it limited the character and nature of the easement sought, the ma-jority opinion uses as an illustration the case of a railroad company seeking to condemn a right of way over the right of way of another railroad, and assumes a case in which the petitioning company offers to construct an overhead or underground crossing. This offer could only be for the purpose of reducing the amount of damages. An illus-tration more apt would be one where a railroad company should attempt to condemn the right of way of another railroad, and in order to obviate the objection that the prop-erty was already devoted to the same public use, would, in its petition, offer to permit the old company to use the right of way with it, jointly. It must be manifest that an offer of this kind would not entitle the petitioner to condemn. It should also be noted in this connection that the offer by the telegraph company does not state upon what terms it will permit the use of its poles, etc., by the railroad com-pany. The only purpose that can be accomplished in any case by limiting the character of the easement sought to be condemned is to reduce the amount of the damages, and in no case can any such offer or provision in the petition operate to confer upon the petitioner a right to condemn which it otherwise would not have.

There is no basis for the statement in the majority opin-ion that this amendment was made because it had developed on the trial that the railroad company had, by permission or license from the telegraph company, strung a telephone wire and some signal wires for short distances at certain places on the poles of the telegraph company. We are un-able to find any basis in the record for this statement, and

this is not the explanation given by the telegraph company of the reason for filing the amendment. It states in its brief and argument: "It may be argued that, regardless of the fact that the defendants had never located either a pole line of their own or any wire upon a pole line" of the telegraph company, "yet the mere fact that there existed one wire of the defendant carried on the poles of the New York Telegraph Company precludes any telegraph company * * * from condemning a right of way on the same side of the track or within a certain but undefined distance of that wire. *It was to meet and overcome such an objection* that petitioner added the amendment of January 12, 1914, to its condemnation petition."

The majority opinion also states in support of the conclusion that the wire claimed by the railroad company in fact belongs to the telegraph company, that this wire was only a part of the accommodation furnished; that the telegraph company furnished with it support for its poles and cross-arms, electric current from its batteries and necessary connections and other things which made the wire part of the entire system and which were much greater than the cost of the wire when placed on the company's poles. What is "much greater" the opinion does not point out. It does appear, however, from the record that the estimated cost of the wire, alone, and labor to put it up, was $2615.92. It also appears that in addition to stringing that wire the railroad company ordered that it be "cut into" certain stations and offices along the line, and that the final bill paid by the railroad company for "material used and labor, freight and other expenses," was $3820.61. It therefore appears that the railroad company paid all the cost connected with the installation of the wire ready for service; and so far as support of this wire by the poles and cross-arms of the telegraph company is concerned, that was part of the consideration for the use of the right of way by the telegraph company under its contract. The statement in the majority

opinion that "the effect of the contract, and the transaction consummated pursuant thereto, was that the telegraph company added an additional wire to its system and the railroad company paid a certain price for its use," is therefore not supported by the evidence.

The majority opinion also states: "At the time of filing the suit the contract between the Western Union Telegraph Company of New York and the Louisville and Nashville Railroad Company had been terminated by notice duly given as provided." This is not an accurate statement and to us seems to be misleading. The contract was still in force when this suit was filed and the railroad company was still fettered by its contract with the New York Telegraph Company, the latter company having the right to continue the maintenance of its pole line on the railroad right of way to the exclusion of any such lines constructed by the railroad company. The petition herein was filed February 3, 1912, while the contract did not terminate until August 17, 1912, and for that reason the railroad company had had no opportunity to construct or begin the construction of its own line when the petition was filed. The majority opinion continues: "And subsequently the railroad company gave to the Western Union notice to remove all its poles, wires and other property from the railroad right of way." This notice was given on August 5,—twelve days before the time fixed by the telegraph company for terminating the contract,—and notified the telegraph company to begin such removal immediately after August 17. As between the railroad company and the New York Telegraph Company it was the duty of the latter company to comply with this notice.

The majority opinion assumes that the railroad company is bound to accept the offer of the telegraph company to permit it to string its wires on the poles of the telegraph company, and if it refuses to accept the offer it must construct its lines on some other part of its right of way, and

ignores the fact that the railroad company had, before the petition was filed, obtained by contract its right of way for a telegraph line. The case of *Golconda Northern Railway* v. *Gulf Lines Connecting Railroad of Illinois,* 265 Ill. 194, is cited in the majority opinion as authority for the proposition that "preference is to be given in condemnation proceedings to the one who first locates the line which is in dispute." That is undoubtedly true where some third person owns the line over which the right of way is located and condemnation proceedings are brought to secure this right of way. That case, however, was not a condemnation proceeding but was a bill in equity by one railroad company against another for an injunction to restrain the latter from interfering with, obstructing or hindering the plaintiff in the construction of its railroad through a certain narrow pass. The defendant was a grantee of another railroad company which had obtained deeds for its right of way through this pass from the owners of the land, such deeds containing conditions subsequent requiring the road to be constructed by a certain time. The complainant had subsequently obtained deeds from the same land owners for the same right of way through the pass, and claimed, among other things, that the former grants had become forfeited by the failure to construct the road within the time limits of the deeds, and therefore it held title to the right of way by virtue of subsequent deeds. The decision was against complainant, it being held that only the owners of the land, their heirs and devisees, could take advantage of a breach of a condition subsequent. Instead of being an authority in favor of the proposition announced in the majority opinion, it seems to us that this case recognizes the doctrine for which we contend, that one company may by deed or contract obtain the preferential right over another company seeking thereafter to obtain a right of way over the same premises for the same purpose. Moreover, there is a statute which applies to the location of rights of way by rail-

270 — 29

roads which requires a railroad company to file a plat showing the location of its railroad in the office of the recorder of deeds within six months after the railroad is located. (Hurd's Stat. 1913, chap. 109, sec. 9.)

The judgment of the county court should be affirmed.